THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* ROBERT D. LONG, Defendant-Appellee.

Third District No. 3—83—0690

Opinion filed June 14, 1984.

John A. Barra, State's Attorney, of Peoria (John X. Breslin and Gerry R. Arnold, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Joseph M. Gibson, of Peoria, for appellee.

JUSTICE SCOTT delivered the opinion of the court:

On the evening of May 20, 1983, the defendant was driving on Illinois Route 116 in Peoria County. As he approached to within 100 yards of a police checkpoint he pulled off the road and parked on the shoulder. A State police officer approached the defendant's car and after observing the defendant asked him to perform several field sobriety tests. The defendant was then arrested for driving under the influence of intoxicating liquor. The trial court granted the defendant's motion to quash his arrest and to suppress the evidence seized as a result of the arrest. The State certified that the suppression order substantially impairs its ability to prosecute the defendant, and timely filed a notice of appeal. We reverse and remand.

On October 18, 1983, the trial court conducted a hearing on the defendant's motion to quash his arrest and to suppress the evidence seized as a result of the arrest. The court heard testimony by the arresting officer, the defendant, and a passenger in the defendant's car on the night of the defendant's arrest.

Mark Bramlet, an Illinois State police officer, testified as follows. On the night of May 20, 1983, a stationary driver's license checkpoint was set up on Illinois Route 116, one-half mile west of Airport Road in Peoria County, for the purpose of checking driver's licenses. The area at which the checkpoint was located on Route 116 was in a valley. At the checkpoint five State police vehicles were parked on the shoulder of the road and three or four more were in a nearby parking lot. While the headlights of the police cars were not on, the flashing red lights on several of the cars were on and emergency yellow lights may have been on some of the cars. None of the police cars were on or blocking the road, and there were no barricades or flares.

The officers stopped all vehicles traveling on Route 116. Officer

Bramlet observed the defendant's car, a 1968 Corvette, approach within approximately 100 yards of the checkpoint. At the time, the officers were standing near their cars waiting for the defendant's car to reach the checkpoint. The officer gave conflicting testimony as to whether the defendant slowed down or actually stopped on the road itself before pulling off onto the shoulder. However, the defendant was not stopped by the police.

Bramlet approached the defendant's car and initially asked "if there was a problem." He then inquired whether the defendant was sick and asked the defendant why he pulled off the road onto the shoulder. The defendant answered that he thought there might have been an accident. Bramlet advised him that the police were conducting a driver's license check and that he would like to see the defendant's driver's license. The officer testified that he asked the defendant to proceed to the checkpoint. However, it is unclear from the record at what point in the above sequence of events the officer made this request.

As the officer was speaking with the defendant, he detected an odor of liquor on the defendant's breath. He also noticed that the defendant's speech was "somewhat slurred" and that the defendant had difficulty in producing his license. The officer then asked the defendant to perform several field sobriety tests. There is also conflicting testimony as to the number of tests that the defendant actually agreed to perform and the exact results of those tests. The defendant was, however, arrested for driving under the influence of intoxicating liquor. (Ill. Rev. Stat., 1982 Supp., ch. 95½, par. 11–501(1).) He was taken to a State police mobile communications van located at the license checkpoint, where he refused to submit to a breath analysis.

Bramlet admitted that he had no warrant for the defendant's arrest and that he had not observed the defendant commit any traffic offense other than coming to a stop on the road. The defendant did not obstruct any traffic at the time he stopped and no vehicles approached the defendant's car from behind.

The defendant testified that to his knowledge no warrant was outstanding for his arrest on the night of May 20, 1983, and he had not committed any criminal offense. He testified that he was not stopped by the police. Rather, he stopped because he thought there had been an accident ahead of him.

Linda Smith, a friend of the defendant's who was in his car on the night of May 20, 1983, testified as follows. As they approached the checkpoint they could see police car lights and the defendant com-

mented that there must be an accident ahead. They hesitated and then pulled off the road some distance from the police cars. A police officer walked up to the car and asked to see the defendant's driver's license. The defendant had trouble getting his license because his pocket was tight. The officer asked the defendant to perform several sobriety tests.

After argument by counsel, the trial court ruled that the detention, arrest, and evidence were without probable cause and granted the defendant's motion to quash his arrest and to suppress the evidence seized as a result of the arrest.

On appeal, the State suggests three grounds in support of its contention that the trial court erred in quashing the defendant's arrest and suppressing the evidence seized. First, the State argues that the defendant halted his progress as a result of the license checkpoint and was sufficiently within the territory surrounding the checkpoint to be subject to the officer's request that he produce his driver's license. Secondly, the State argues that because the defendant stopped his car prior to reaching the checkpoint, the officers could reasonably assume that the defendant was attempting to avoid the checkpoint and could properly request that he display his license as part of the license check. Thirdly, the State argues that since the defendant stopped his car and pulled onto the shoulder of the road, the arresting officer had a duty to approach and determine whether the defendant required assistance.

We must determine on appeal whether the trial court erred in quashing the defendant's arrest for driving under the influence of intoxicating liquor and suppressing the evidence seized where the defendant stopped and parked his car on the shoulder of the road within approximately 100 yards of a stationary driver's license checkpoint.

■ The United States Supreme Court noted in *Delaware v. Prouse* (1979), 440 U.S. 648, 59 L. Ed. 2d 660, 99 S. Ct. 1391, that when a police officer stops a car and detains its occupants, a "seizure" within the meaning of the fourth and fourteenth amendments has occurred, even though the detention was for a limited purpose and was brief. Whether a particular police practice is permissible is to be judged by a standard of reasonableness whereby the intrusion on an individual's fourth amendment interests caused by the police practice is balanced against its promotion of legitimate governmental interests. (440 U.S. 648, 654, 59 L. Ed. 2d 660, 667-68, 99 S. Ct. 1391, 1396.) The court expressly stated that States are not precluded from developing spot checks that involve only a limited amount of intrusion

or do not involve an unconstrained exercise of discretion. It indicated that one alternative would be to question all oncoming traffic at road-block-type stops. 440 U.S. 648, 663, 59 L. Ed. 2d 660, 673-74, 99 S. Ct. 1391, 1401.

The checkpoint in the case at bar did not involve an unconstrained exercise of discretion by the police officers. Rather, as suggested in *Prouse,* all cars, traveling either east or west, were stopped for the purpose of checking driver's licenses. Judged by the standard of reasonableness set forth in *Prouse* the legitimate governmental interest promoted by the checkpoint—ensuring that only those qualified to do so are permitted to drive cars—outweighed the defendant's fourth amendment interests. Therefore, the stationary driver's license checkpoint was proper.

We also hold that the defendant was sufficiently close to the area in which the check was being conducted to be subject to the officer's request that he produce his driver's license. A checkpoint encompasses not only the immediate area at which vehicles stop in response to requests by the police, but also the area within a reasonable distance from the checkpoint. A motorist may not avoid having his driver's license checked by attempting to evade a stationary checkpoint. (See *Morgan v. Town of Heidelberg* (1963), 246 Miss. 481, 150 So. 2d 512.) We believe that the determination of what is a "reasonable distance" from a checkpoint must be judged objectively, based on the facts in each case. Here, the fact that the defendant stopped within 100 yards of where the police were located, close enough that Officer Bramlet walked over to the defendant's car, indicates that the defendant stopped within the area encompassed by the checkpoint.

We have determined that the stationary checkpoint set up on Route 116 was proper and that, since the defendant stopped at a point encompassed by the checkpoint, he could be requested to produce his driver's license. Next, we consider whether Officer Bramlet properly asked the defendant to step out of his car to perform sobriety tests.

In *Pennsylvania v. Mimms* (1977), 434 U.S. 106, 54 L. Ed. 2d 331, 98 S. Ct. 330, the United States Supreme Court held that a police officer's request that the defendant get out of his car, issued after the defendant was lawfully detained, was reasonable and thus permissible under the fourth amendment. The Supreme Court stated that the inconvenience to the defendant as a result of the order could not prevail when balanced against the State's legitimate concern for the officer's safety.

■ In the present case, the defendant was not stopped by the po-

lice. Rather, he made the decision to stop on the shoulder of the road. As stated above, since the checkpoint was proper, the defendant was lawfully detained when the officer requested that the defendant produce his driver's license. Officer Bramlet testified that while he was speaking with the defendant he detected an odor of liquor on the defendant's breath and noticed that his speech was slurred. The officer also indicated that the defendant had difficulty producing his license. Thus, "specific and articulable facts" existed which, when taken together with the rational inferences from those facts, reasonably warranted the officer's request that the defendant step out of his car and perform several sobriety tests. *Terry v. Ohio* (1968), 392 U.S. 1, 21, 20 L. Ed. 2d 889, 905-06, 88 S. Ct. 1868, 1879-80.

Officer Bramlet testified that after the defendant stepped out of the car he failed the finger-to-nose test and refused to attempt to perform several other tests. The defendant was therefore arrested for driving under the influence of intoxicating liquor and was escorted to the police van. At the van the defendant was read a request to submit to a breath analysis and refused to do so.

In *South Dakota v. Neville* (1983), 459 U.S. 553, 74 L. Ed. 2d 748, 103 S. Ct. 916, the United States Supreme Court held that a State may compel a driver to submit to a breath test since he has no constitutional right to refuse to take the test. Thus, evidence of his conduct in refusing to submit to the test can be properly admitted at trial. Recently, in *People v. Rolfingsmeyer* (1984), 101 Ill. 2d 137, the Illinois Supreme Court held that *Neville* is applicable to section 11—501.2 of the Illinois Vehicle Code. (Ill. Rev. Stat. 1981, ch. 95½, par. 11—501.2.) Section 11—501.2(c) provides that an accused's refusal to submit to a breath test shall be admissible as evidence at his trial. Thus, the court explained, section 11—501.2 does not offend either the United States Constitution or article I, section 10, of the Constitution of Illinois. We note that under *Rolfingsmeyer*, the defendant's refusal in the instant case to submit to a breath analysis may be admissible at trial.

For the foregoing reasons, the order of the circuit court of Peoria County is reversed.

Reversed and remanded.

BARRY and HEIPLE, JJ., concur.